UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
VINCENT BORRERO, JR.,

                            Plaintiff,

                                                    **MEMORANDUM & ORDER**
            - against -                              16-CV-2616 (PKC)

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                            Defendant.
-------------------------------------------------------x

PAMELA K. CHEN, United States District Judge:

        Plaintiff Vincent Borrero, Jr. ("Plaintiff") brings this action under 42 U.S.C. § 405(g),

seeking judicial review of the Social Security Administration's ("SSA") denial of his claim for

Disability Insurance Benefits ("DIB").  The parties have cross-moved for judgment on the

pleadings.  (Dkts. 10 & 13.)  Plaintiff seeks reversal of the Commissioner's decision and remand

for an award of benefits, or alternatively, remand for further administrative proceedings.  (Dkt.

10.)  The Commissioner seeks affirmance of the denial of Plaintiff's claim.  (Dkt. 13.)  For the

reasons set forth below, the Court GRANTS Plaintiff's motion for judgment on the pleadings

and DENIES the Commissioner's motion.  The case is remanded for further proceedings

consistent with this order.

## BACKGROUND

## I.    PROCEDURAL HISTORY

        Plaintiff filed an application for DIB on May 20, 2013, alleging disability beginning

September 8, 2012 due to panic attacks, anxiety disorder, chronic back pain, and depression.

(Tr. 154–55, 168.)  On September 16, 2013, the SSA denied Plaintiff's claim.  (Tr. 74.)  Plaintiff

requested a hearing before an Administrative Law Judge ("ALJ") on October 7, 2013.  (Tr. 90.)

Plaintiff, represented by counsel, appeared at a hearing before ALJ Michael Friedman on February 26, 2015. (Tr. 55–66.) In a decision dated March 6, 2015, ALJ Freidman denied Plaintiff's claim. (Tr. 9–11.) The Appeals Council denied Plaintiff's request for review on May 11, 2016. (Tr. 1–3.) Plaintiff timely filed this action on May 20, 2016. (Dkt. 1.)

## II.    ADMINISTRATIVE RECORD

### A.    Medical Evidence Prior to September 8, 2012 (Disability Onset Date Alleged in Application)

#### 1.    Treating Physician: Dr. Hartman Martin

On September 9, 2011, Plaintiff visited Dr. Hartman Martin ("Dr. Martin"), a board certified internist, complaining of anxiety disorder and back pain. (Tr. 261.) Plaintiff reported dealing with anxiety for an extended duration, and reported dry mouth, sweating, difficulty swallowing, irregular heartbeat, and irritability. (*Id*.) Regarding his back pain, Plaintiff complained that it was in the lower region of his back, and was of an "aching nature" that was moderate to severe. (*Id*.) He also reported lumbar pain, muscle aches, and stiffness. (*Id*.) Plaintiff did not know when the back pain had started, but stated that the pain was extended and intermittent, occurring frequently. (*Id*.) The pain was exacerbated by heavy lifting, as well as Plaintiff's work as a sanitation worker. (*Id.*) Plaintiff denied having chest pain. (*Id.*) Plaintiff was taking Xanax, provided by Dr. Martin, as well as Roxicodone and Percocet from other providers. (Tr. 262.)

Dr. Martin examined Plaintiff and reported that he was in no apparent distress. (*Id.*) Inspection revealed normal cervical and thoracic spines. (*Id.*) Inspection of his lumbar spine revealed lordosis and paraspinal muscle spasm. (*Id.*) Plaintiff had full range of motion in all joints. (*Id.*) Dr. Martin wrote that Plaintiff's pain was somewhat diminished because he had taken an Oxycodone pill shortly before the visit. (*Id.*) He diagnosed Plaintiff with unspecified

2

backache, unspecified anxiety, and tobacco use disorder (but found that the latter was "better"). (Tr. 263.)  Dr. Martin advised Plaintiff to continue taking his current medication, referred him to a psychiatrist, and encouraged him to find alternative employment or cut back on his hours because of his pain.  (*Id.*)  Dr. Martin also referred him to physical therapy, but Plaintiff stated that it did not fit his schedule.  (*Id.*)

During the following year, Plaintiff visited Dr. Martin twelve more times.  (Tr. 264–301.) At different visits, he reported that his anxiety disorder manifested in various signs and symptoms, including twitching, headaches, sweating, irritability, panic attacks, and angry feelings.  (Tr. 264, 272, 278, 281, 287.)  Dr. Martin found at multiple visits that Plaintiff's mood and affect were anxious.  (Tr. 265, 279.)  On October 13, 2011, Dr. Martin wrote that Plaintiff's post-traumatic stress disorder ("PTSD") was controlled by Xanax.  (Tr. 265.)

On October 13, 2011 and on January 6, 2012, Plaintiff reported medication dependency and abuse.  (Tr. 264, 272.)  On December 9, 2011, Plaintiff told Dr. Martin that he had lost his Oxycodone prescription, and Dr. Martin informed him that he could not give him a new supply. (Tr. 270.)  He advised him to take Percocet for five days for severe pain.  (Tr. 271.)  On December 8, 2011, Dr. Martin wrote that Plaintiff had acute stress reaction and multiple family stressors including a death in the family.  (Tr. 268.)  On January 6, 2012, Dr. Martin found that Plaintiff was anxious and distressed over recent arrests of members of Plaintiff's family because of violation of an order of protection by his wife.  (Tr. 273.)  Regarding Plaintiff's PTSD and anxiety disorder, Dr. Martin wrote that Plaintiff was under increasing stress, and that his anxiety was worsening.  (Tr. 272–73.)

On April 5, 2012, Plaintiff reported not taking his Xanax because he had been dizzy and felt better without it.  (Tr. 287.)  Dr. Martin wrote that Plaintiff's anxiety symptoms were

improved and that Plaintiff seemed to be benefiting from twice-weekly therapy.  (Tr. 288.)  On August 16, 2012, Plaintiff stated that he was experiencing a high degree of stress and anxiety as a result of his sister's suicide, which was related to the terminal illness of his father.  (Tr. 299.) He had been seen by a psychiatrist and was stable without homicidal or suicidal plans, although was significantly stressed and depressed.  (*Id.*)  Plaintiff reported weight loss, depression, and insomnia or hypersomnia.  (*Id.*)

Regarding Plaintiff's back pain, on October 13, 2011, Dr. Martin wrote that Plaintiff had found a pain management office and was interested in getting an MRI and consultation, but that he was hesitant about getting shots.  (Tr. 264.)  The doctor wrote that Plaintiff's back pain was controlled by Oxycodone.  (Tr. 265.)  On several occasions, Dr. Martin noted that Plaintiff had paraspinal muscle spasm and trigger points in his lumbar spine.  (Tr. 273, 282, 294, 301.)  On January 6, 2012, he assessed Plaintiff as having chronic pain, and wrote that Plaintiff had not gotten an MRI because of family issues and an arrest.  (Tr. 273.)  On January 25, 2012, after receiving the results from an MRI that Plaintiff eventually underwent, Dr. Martin diagnosed Plaintiff with degenerative intervertebral disk disease ("DDD").  (Tr. 276.)  He stated that the disease was complicated by the nature of Plaintiff's work.  (*Id.*)  He repeatedly told Plaintiff that his job was exacerbating his back pain.  (Tr. 265, 276, 281, 285, 297.)  Dr. Martin repeatedly advised Plaintiff to go to physical therapy, but Plaintiff continued to report that it was not possible because of his work and schedule.  (Tr. 273, 298.)

On February 6, 2012, Dr. Martin also assessed for the first time that Plaintiff had mixed hyperlipidemia.  (Tr. 280.)  On March 7, 2012, Dr. Martin discussed lowering Plaintiff's blood pressure and BMI, told him to stop smoking, and stressed diet, weight loss, exercise, and therapeutic lifestyle changes.  (Tr. 282.)

On April 5, 2012, Dr. Martin wrote that Plaintiff's DDD was stable, but that his backache was worse. (Tr. 288.) On May 4, 2012, Dr. Martin wrote that Plaintiff presented with a complaint of chest pain in the left para substernal region, which was of a squeezing nature, occurred daily, and was moderate to severe for two to three hours at a time. (Tr. 290.) Dr. Martin told Plaintiff to go to the emergency room as soon as possible. (Tr. 291.)

On June 6, 2012, Plaintiff again presented with complaints of back and chest pain. (Tr. 293, 296.) Plaintiff also reported Epigastric pain, heartburn, and indigestion. (Tr. 296.) Dr. Martin assessed Plaintiff with atypical chest pain, esophageal reflux, and chronic back pain. (Tr. 294, 297.) Dr. Martin wrote that Plaintiff's chest pain was of a burning nature, but had improved since starting Prilosec and changing his diet. (Tr. 296.) Dr. Martin opined that Plaintiff's atypical chest pain was most likely related to anxiety "vs" airway disease. (Tr. 297.) He noted that Plaintiff was a chronic smoker and was exposed to garbage. (*Id.*) Dr. Martin advised Plaintiff that it was very important to comply with his referral to get an MRI because treatment without accurate diagnostic studies could jeopardize his health. (Tr. 298.) Plaintiff reported that he had been unable to find alternative employment. (Tr. 293.) Dr. Martin referred Plaintiff to a cardiologist. (Tr. 295.) He also placed him on a trial dose of Prilosec. (*Id.*)

On August 16, 2012, Plaintiff denied having chest pain, but reported back pain. (Tr. 299.)

2.    MRI: January 13, 2012

On January 13, 2012, Plaintiff had an MRI with Dr. Mark Shapiro. (Tr. 227.) There was preservation of the normal curvature in his lumbar spine. (*Id.*) The MRI showed left foraminal herniation[1] creating impingement[2] at L4-L5, and central disc herniation creating a ventral

---

[1] The foramina are small openings in the spinal column. A herniated disc occurs when extruded disc nucleus material breaks through a tear in the disc's outer wall and leaks into the

extradural defect[3] at L5-S1, with extension of the disc into the neuroforamen[4] bilaterally.  (*Id.*)
Dr. Shapiro diagnosed left foraminal herniation at L4-L5 and central herniation at L5-S1.  (*Id.*)
Dr. Martin subsequently diagnosed DDD at the next appointment.  (Tr. 276.)

### 3.    Treating Psychiatrist:  Christina Conciatori-Vaglica

An intake and progress note from Dr. Christina Conciatori-Vaglica noted that Plaintiff
was seen on April 2, 2012.  (Tr. 259.)  His anxiety was well controlled with Xanax, and he did
not have depression.  (*Id.*)  Dr. Conciatori-Vaglica wrote that the plan was to continue with the
Xanax.  (*Id.*)  No side effects were reported.  (*Id.*)

### B.    Medical Evidence after September 8, 2012

### 1.    Dr. Martin's Treatment Notes

Plaintiff met with Dr. Martin on September 13, 2012.  (Tr. 302.)  He reported anxiety
disorder, moderate to severe lower back pain of an aching nature that was extended, intermittent,
and occurred frequently.  (*Id.*)  It was relieved by analgesics and worsened by repetitive stress
and heavy lifting.  (*Id.*)  He had trigger points and paraspinal muscle spasms in his lumbar spine.

---

foraminal opening.  *See* Michael Perry, M.D., Laser Spine Institute, *Foraminal Narrowing Overview*,    https://www.laserspineinstitute.com/back_problems/foraminal_narrowing/    (last visited 3/24/17).

[2] Nerve root impingement occurs when the roots of nerves become obstructed or inhibited.  *See* Minimally Invasive Spine Care, *Nerve Root Impingement*, https://spinecare.luminhealth.com/conditions/nerve-root-impingement/ (last visited 3/24/17).

[3] "Ventral" means "of or relating to the belly."  *See* Merriam-Webster Dictionary, *Ventral*,    https://www.merriam-webster.com/dictionary/ventral    (last visited    3/24/17). "Extradural" means situated or occurring outside the dura matter but within the skull.  *See* Merriam-Webster,  *Extradural*,  https://www.merriam-webster.com/medical/extradural  (last visited 3/24/17).

[4] "Neuroforamen refers to the empty space to the left and right of each vertebra that allows nerves to pass from the spinal cord to other parts of the body."  *See* Laser Spine Institute, *Neuroforamen Overview*,  https://www.laserspineinstitute.com/back_problems/spinal_anatomy/ vertebral_column/neuroforamen/ (last visited 3/24/17).

(Tr. 303.) Dr. Martin assessed chronic back pain related to DDD, but found that it was stable and that Plaintiff was still not going to physical therapy. (Tr. 304.)

Plaintiff complained of depression, stating that he had had it for more than six months, and had depressed mood and psychomotor agitation. (Tr. 302.) He also reported anxiety and angry feelings. (*Id.*) He was currently on Xanax and Percocet. (Tr. 303.) Dr. Martin's physical exam revealed that Plaintiff was anxious, distressed, and appeared to be in pain. (*Id.*) Plaintiff's judgment and insight were good, he was oriented in three dimensions, his memory was intact, and his mood and affect were normal. (*Id.*) He was anxious, and had multiple family stressors: the recent deaths/alleged murders of his sister and adopted niece. (*Id.*) Dr. Martin assessed Plaintiff's anxiety and depression as stable. (Tr. 304.) The plan was to lower Plaintiff's blood pressure and BMI, continue his current medical and treatment plan, taper Xanax with the aid of a psychiatrist, and have Plaintiff do back exercises and go to physical therapy. (*Id.*)

Plaintiff continued to meet with Dr. Martin about once per month. Regarding his anxiety, Plaintiff continued to report, at different times, a variety of symptoms—dry mouth, sweating, difficulty swallowing, dizziness, difficulty sleeping, fatigue, twitching, headache, diarrhea, and irritability. (Tr. 305, 311, 326, 338, 345, 348, 350.) On March 6, 2013, Dr. Martin wrote that Plaintiff's anxiety was "better." (Tr. 318.) On August 22, 2013, Dr. Martin wrote that Plaintiff had multiple stressors for his anxiety/depression, but was "raising [sic] to the occasion with the aid of psychotherapy." (Tr. 334.) On October 25, 2013, Plaintiff reported that he was stressed out by his girlfriend's father's illness, which was placing stress on their relationship. (Tr. 338.) On April 3, 2014, Plaintiff reported that he was under a lot of stress from the discovery that his son may have been molested by the mother's husband. (Tr. 345.) On May 8, 2014, Dr. Martin diagnosed Plaintiff with an acute reaction to stress. (Tr. 349.)

Dr. Martin continued to advise Plaintiff that his back pain was made worse by his failure to attend physical therapy and by his occupation. (Tr. 309, 312, 316, 326, 343.) The doctor repeatedly found trigger points and paraspinal muscle spasms in the lumbar area. (Tr. 312, 315, 318, 321.) On October 5, 2012, Dr. Martin wrote that Plaintiff limped while walking. (Tr. 306.) On December 6, 2012, Plaintiff saw Dr. Martin for an acute exacerbation of his back pain, and Dr. Martin wrote that Plaintiff "need[ed] to quit his job" and that there was a danger of being dependent on prescription narcotics. (Tr. 312.) Dr. Martin continued to find trigger points and muscle spasms. (Tr. 306, 312, 315.) On March 6, 2013, Dr. Martin reported that Plaintiff's back pain was improved because his job description had changed. (Tr. 317.) On April 4, 2013, Dr. Martin wrote that since Plaintiff had been let go from or had quit his job, he was encouraged to make a greater effort to do physical therapy. (Tr. 322.)

On May 2, 2013, Dr. Martin reported that Plaintiff's back pain and DDD was worse since Plaintiff had returned to work, but also noted that he had a decreased schedule. (Tr. 324.) On June 25, 2013, he again reported worsening back pain. (Tr. 330.) In August and September, 2013, Plaintiff was unable to do physical therapy because he was awaiting stress test results and needed cardiac clearance. (Tr. 333–35.) On April 3, 2014, Plaintiff reported that he could not get physical therapy because he had been cut off from Medicaid coverage. (Tr. 346.) On May 8, 2014, Dr. Martin wrote that Plaintiff's chronic back pain had improved since he was not working as frequently. (Tr. 349.)

Dr. Martin found at these appointments that Plaintiff's neurologic examinations were intact, and that Plaintiff had normal sensation and deep tendon reflexes. (Tr. 303, 318, 333, 336, 343, 346.) At most appointments, Dr. Martin found that Plaintiff had a normal gait, (Tr. 309,

318, 324, 333, 336, 340, 343, 346), with the exception of October 5, 2012, when Dr. Martin found that he was limping. (Tr. 306.).

Plaintiff continued to complain of chest pain. (Tr. 319, 320.) On April 4, 2013, Dr. Martin wrote that Plaintiff had still not seen a cardiologist about his chest pain. (Tr. 321.) On May 2, 2013, Dr. Martin wrote that he had expressed his displeasure with Plaintiff's lack of follow-up with referrals; he had still not made a neurology appointment or a physical therapy appointment. (Tr. 324.) On June 27, 2013, Dr. Martin reported that Plaintiff needed a stress test and had scheduled a test with a cardiologist. (Tr. 327.) On August 22, 2013, Plaintiff reported that his chest pain in his substernal and left para substernal region was of a squeezing nature, with mild to moderate severity. (Tr. 332.) By this appointment, Plaintiff had gotten a stress test. (Tr. 333.) However, as of October 25, 2013, Dr. Martin wrote that Plaintiff's work-up was not complete and Plaintiff was "getting th[]e run around from the hospital." (Tr. 340.) By November 22, 2013, Dr. Martin noted that Plaintiff had had cardiac tests done and encouraged him to follow up with cardiology. (Tr. 342, 344.)

On March 6, 2013, Plaintiff reported hemi-torso pain and numbness in his left lower extremity. (Tr. 317.) Dr. Martin wrote that Plaintiff would need an MRI of the brain and a C/T scan of the spine to rule out MS.[5] (Tr. 319.) On April 4, 2013, Plaintiff complained of hemiparesis[6] in his left side. (Tr. 320.) Dr. Martin wrote that Plaintiff had still not seen a neurologist about the hemiparesis, but that Plaintiff was aware of the importance of doing so.

---

[5] The Court assumes this refers to multiple sclerosis, a disease that affects the brain and spinal cord. *See* Merriam-Webster Dictionary, *Multiple Sclerosis*, http://www.webmd.com/multiple-sclerosis/default.htm (last visited 3/24/17).

[6] Hemiparesis is muscular weakness or partial paralysis restricted to one side of the body. *See* Merriam-Webster Dictionary, *Hemiparesis*, https://www.merriam-webster.com/medical/hemiparesis (last visited 3/23/17.)

(Tr. 321.) Dr. Martin also prescribed Neurontin, a new medication. (Tr. 322.) On May 2, 2013, the hemiparasthesis symptoms were not present, and Plaintiff reported that they seemed worse with movement. (Tr. 323.) Plaintiff reported that he had not gone to the neurologist, and had not continued to take Neurontin because it gave him stomach ache. (Tr. 323.) Dr. Martin examined Plaintiff and found him to be neurologically intact. (Tr. 324.) On October 25, 2013, Plaintiff's neurological exam was again normal. (Tr. 340.)

On December 6, 2012, Dr. Martin wrote that Plaintiff's tobacco abuse disorder was worse, that he was asthmatic, and that he was a danger to himself and to his son. (Tr. 312.)

On September 26, 2013, Dr. Martin diagnosed Plaintiff with an acute upper respiratory infection. (Tr. 337.) On November 22, 2013, Plaintiff saw Dr. Martin for vomiting and diarrhea, which Dr. Martin suspected was food poisoning. (Tr. 342–43.)

Throughout Plaintiff's treatment with Dr. Martin, Dr. Martin advised Plaintiff to stop smoking, lower his blood pressure, and lose weight. (Tr. 340, 344, 347, 352.) Dr. Martin also treated Plaintiff for mild to moderate gastroesophageal reflux disease. (Tr. 308.) As of June 5, 2014, Plaintiff was taking Prilosec, Calcium, Zocor, Neurontin, Pravachol, Percocet, and Xanax. (Tr. 350–51.)

Plaintiff continued to visit Dr. Martin monthly between July and October, 2014. (Tr. 353–64.) On July 9, 2014, Plaintiff was still experiencing anxiety over his son's molestation. (Tr. 353.) On August 7, 2014, Plaintiff reported that he was less stressed because court proceedings were going well, and his son was coping better. (Tr. 356, 360.) He continued to experience back pain, and Dr. Martin continued to recommend physical therapy and a change in job. (Tr. 354, 357, 363.) On October 2, 2014, Plaintiff had trigger points and paraspinal muscle spasms in the lumbar area. (Tr. 360.)

2.    Dr. Martin's November 14, 2013 Questionnaire

On November 14, 2013, Dr. Martin reported that he had treated Plaintiff for lumbar and cervical back pain due to DDD.  (Tr. 223–26.)  His objective findings were disc herniation at L4-L5 and L5-S1, and neck/cervical back pain involving C2-C3, C4-C5, and C5-C6.  (Tr. 223.)  He wrote that Plaintiff could lift and carry a maximum of twenty pounds on a frequent basis, could stand and walk (with normal breaks) for a maximum of four hours during an eight-hour day, and could sit (with normal breaks) for a maximum of four hours during an eight-hour day.  (Tr. 224.)  He wrote that Plaintiff could sit for forty-five minutes before needing to change positions and could stand for thirty minutes before needing to change positions.  (*Id.*)  He needed to walk around every forty-five minutes for five minutes.  (*Id.*)  He wrote that Plaintiff needed the opportunity to shift at will from sitting or standing/walking.  (Tr. 224–25.)  Plaintiff did not need to lie down at unpredictable intervals.  (Tr. 225.)  To support these limitations, Dr. Martin wrote that Plaintiff had point tenderness in the paraspinal muscles of the neck and lower back and positive straight-leg lifting.  (*Id.*)

Dr. Martin wrote that Plaintiff could frequently twist, occasionally stoop (bend), crouch, climb stairs, and could not climb ladders.  (*Id.*)  Plaintiff did not need an assistive device.  (*Id.*)  Dr. Martin opined that Plaintiff's impairment affected his ability to reach and push/pull, but did not affect his handling (gross manipulation), fingering (fine manipulation), or feeling.  (*Id.*)  He wrote that Plaintiff experienced some pain with reaching and pushing/pulling.  (Tr. 225–26.)  This finding was supported by the MRI findings.  (Tr. 226.)  Plaintiff's medications were listed as Oxycodone, Neurontin, Xanax, and Ibuprofen.  (*Id.*)

Dr. Martin opined that Plaintiff's impairments or treatment would cause him to be absent from work three or more times per month.  (*Id.*)  He wrote that Plaintiff's limitations had been present since Dr. Martin had begun treating Plaintiff.  (*Id.*)

11

3.      Dr. Martin's December 24, 2014 Submission

On December 24, 2014, Dr. Martin indicated that he had reviewed his November 14, 2013 letter, and that "neither the patient's condition and impairments nor [Dr. Martin's] opinions ha[d] changed materially."  (Tr. 230.)

4.      Dr. Christina Conciatori-Vaglica

Dr. Christina Conciatori-Vaglica ("Dr. Conciatori-Vaglica") saw Plaintiff on February 4, 2013, and noted that he was doing well on Xanax.  (Tr. 259.)  She saw him again on May 6, 2013, August 2, 2013, November 22, 2013, April 4, 2014, and May 30, 2014, renewing his Xanax prescription and stating that he continued to do well on the Xanax.  (*Id.*)

5.      May 13, 2013 MRI

A May 13, 2013 cervical spine MRI, ordered by Dr. Martin, appeared to show a disc bulge with anterior use impingement and foraminal impingement at C2-C3; a left foraminal disc herniation with significant left foraminal impingement and mild right foraminal impingement at C4-C5; and a disc bulge with bilateral herniation and foraminal impingement, which was severe on the left side and moderate to severe on the right side, at C5-C6.  (Tr. 228–29.)

6.      Consultative Psychiatrist:  Dr. Jean Brown

On September 9, 2013, Plaintiff was examined by consultative psychiatrist Dr. Jean Brown ("Dr. Brown").  (Tr. 213–17.)  Plaintiff denied a history of psychiatric hospitalization or outpatient treatment, but reported seeing a psychiatrist between one and three times per month.  (Tr. 214.)  Plaintiff reported being hospitalized in 2012 for a heart attack and in 2013 for a stress test.  (*Id.*)  He reported that his current medications were Oxycodone, Xanax, Neurontin, and Ibuprofen.  (*Id.*)

Plaintiff reported that he frequently woke up three times per night.  (*Id.*)  His appetite was normal.  (*Id.*)  He stated that his depression symptoms began in 1996 when his father and sister

passed away within a month; he also reported dysphoric mood, loss of usual interest, and social withdrawal.  (*Id.*)  He denied current thoughts of death or suicide.  (*Id.*)  Plaintiff stated that his anxiety symptoms began in 1996, and he described excessive apprehension and worry, restlessness, hypervigilance, and panic attacks during which he would experience sweating, breathing difficulties, chest pain, and choking sensation in enclosed spaces.  (Tr. 214–15.)  He denied manic symptoms, thought disorders, or cognitive symptoms.  (Tr. 215.)

Dr. Brown found that Plaintiff was cooperative, that his posture and motor behavior were normal, eye contact and affect were appropriate, sensorium was clear, and that he was oriented in three dimensions.  (*Id.*)  His mood was euthymic.[7]  (*Id.*)  Plaintiff's attention and concentration were intact, but his recent and remote memory skills were mildly impaired due to distractibility.  (*Id.*)  His intellectual functioning was average, his general fund of information was appropriate to experience, and his insight and judgment were good.  (Tr. 215–16.)

Plaintiff reported that he could dress, bathe, groom himself, cook, and prepare food, but needed assistance with general cleaning, laundry, and shopping due to back problems.  (Tr. 216.)  He reported trying to avoid taking public transportation due to anxiety and panic attacks.  (*Id.*)  He reported that he socialized with no one, and his family relationships were "not good."  (*Id.*)

Dr. Brown's medical source statement concluded that Plaintiff could follow and understand simple instructions and directions.  (*Id.*)  He could also perform simple tasks with assistance.  (*Id.*)  He was mildly limited in his ability to maintain attention and concentration.  (*Id.*)  He could maintain a regular schedule, learn new tasks, perform complex tasks with assistance, make appropriate decisions, and relate adequately with others.  (*Id.*)  He was

---

[7] Euthymia is a normal, tranquil mental state or mood; specifically, a stable mental state or mood in those affected with bipolar disorder that is neither manic nor depressive.  *See* Merriam-Webster Dictionary, *Euthymia*, https://www.merriam-webster.com/medical/euthymia (last visited 3/24/17).

moderately limited in his ability to deal appropriately with stress, due to distractibility, depression, anxiety, and panic attacks. (*Id.*) Dr. Brown concluded that the results of the examination were consistent with psychiatric problems, which "may significantly interfere with the claimant's ability to function on a daily basis." (*Id.*) Dr. Brown diagnosed depressive disorder, panic disorder without agoraphobia, and anxiety disorder, as well as severe back pain and a history of having a heart attack. (Tr. 216–17.) Dr. Brown recommended that Plaintiff continue with his psychiatric and psychological treatment as currently provided, and that his prognosis was good. (Tr. 217.)

### 7.    Consultative Orthopedist:  Louis Tranese

On September 9, 2013, Plaintiff was examined by Dr. Louis Tranese ("Dr. Tranese"), a consultative orthopedic examiner. (Tr. 218-22.) Plaintiff complained of a two-year history of back pain. (Tr. 219.) He stated that he did not have a history of back injury, instead attributing his neck and back pain to work-related stressors. (*Id.*) Plaintiff reported that his back pain was more severe than his neck pain, and that his neck pain was episodic while his lower back pain was constant. (*Id.*) He characterized both his neck and back pain as a dull, stiff ache that was alternatively sharp and stabbing. (*Id.*) Plaintiff did not complain of radiation of his neck or back pain into upper or lower extremities. (*Id.*) Plaintiff stated that his pain was aggravated by uncomfortable sleeping positions and by heavy lifting. (*Id.*) Bending and walking long distances increased his back pain; repetitive overhead activities aggravated his neck pain. (*Id.*) Plaintiff's pain was minimally relieved by medication, but the relief was temporary. (*Id.*)

Dr. Tranese reported that Plaintiff had a past medical history of heart attack, for which he had been hospitalized at Brooklyn Hospital for a week in 2012. (*Id.*) Plaintiff's current medications were Oxycodone, Xanax, Neurontin, and Ibuprofen. (Tr. 219–20.)

14

Plaintiff reported a history of tobacco and alcohol use. (Tr. 220.) At the time of the examination, he smoked a half-pack of cigarettes per day. (*Id.*) Plaintiff reported being able to cook independently three times per week, but depended on others for cleaning, laundry, and shopping. (*Id.*) On a daily basis, he was able to shower, dress, and groom himself independently. (*Id.*)

Dr. Tranese reported that Plaintiff did not appear to be in acute distress, his gait was normal, and he could walk on his heels and toes without difficulty. (*Id.*) He was able to squat and used no assistive device. (*Id.*) He needed no help changing for the exam or getting on and off the exam table, and he was able to rise from his chair without difficulty. (*Id.*) Dr. Tranese examined Plaintiff's cervical spine and found full flexion, extension, lateral flexion bilaterally, and rotary movements bilaterally. (*Id.*) He found no cervical or paracervical pain or spasm, and no trigger points. (*Id.*) Plaintiff had full range of motion in his shoulders, elbows, forearms, wrists, and fingers bilaterally. (*Id.*) He had no joint inflammation, effusion, or instability. (*Id.*) He had 5/5 strength in his proximal and distal muscles, and no muscle atrophy. (Tr. 220–21.) Plaintiff had no sensory abnormality, and his reflexes were physiologic[8] and equal. (Tr. 221.)

Dr. Tranese also examined Plaintiff's thoracic and lumbar spines. (*Id.*) He found flexion was to degrees limited by pain, extension was full, lateral flexion was to 20 degrees bilaterally, and rotary movements were to 15 to 20 degrees bilaterally, limited by functional restriction. (*Id.*) Plaintiff reported bilateral lower lumbar paraspinal tenderness. (*Id.*) There were no spasms, sacroiliac joint or sciatic notch tenderness, scoliosis, kyphosis, or trigger points. (*Id.*) The

---

[8] Characteristic of or appropriate to an organism's healthy or normal functioning. *See* Merriam-Webster Dictonary, *Physiologic*, https://www.merriam-webster.com/ dictionary/physio logical (last visited 3/24/17).

straight-leg test was positive only in the supine position at approximately 60 degrees hip flexion bilaterally.  (*Id.*)

Regarding Plaintiff's lower extremities, Dr. Tranese found that Plaintiff had full range of motion in his hips, knees, and ankles bilaterally, 5/5 strength in proximal and distal muscles bilaterally, no muscle atrophy, and no sensory abnormality.  (*Id.*)  His reflexes were physiologic and equal, and there was no joint effusion, inflammation, or instability.  (*Id.*)

Dr. Tranese diagnosed low back pain, chronic neck pain, multiple cervical and lumbar disc herniations/bulges (from the MRI), and reported history of heart attack.  (*Id.*)  He stated that the prognosis was "fair to good."  (*Id.*)  His medical source statement was that Plaintiff had a mild-to-moderate restriction with activities that required repetitive heavy lifting, mild restriction with frequent bending, and no other physical functional deficits.  (*Id.*)

8.    Consultative Examiner:  Dr. Chaim Shtock

On February 10, 2015, consultative examiner Dr. Chaim Shtock ("Dr. Shtock") gave Plaintiff an orthopedic examination.  (Tr. 239.)  Plaintiff reported that he had started having lower back pain six or seven years ago while working in landscaping and sanitation.  (*Id.*)  Five years ago he had seen his primary physician for the back pain, had been referred for an X-ray and an MRI, and had been prescribed medication.  (*Id.*)

At the examination, Plaintiff reported back pain that was a six to seven out of ten and was aggravated by prolonged sitting, excessive bending, and heavy lifting.  (*Id.*)  He reported that the pain occasionally started from the neck down, and that he had episodic numbness in his left arm. (*Id.*)  His pain was relieved by rest, refraining from aggravating activities, and medication.  (*Id.*)

Plaintiff reported that he had suffered a heart attack in 2012, and had spent four to five days in Brooklyn Hospital as a result.  (*Id.*)  He also reported anxiety and panic attacks starting in 1996.  (*Id.*)

16

Plaintiff stated that he was currently taking Cyclobenzaprine, Alprazolam, Oxycodone, and Ibuprofen.  (*Id.*)  He acknowledged smoking five to six cigarettes a day.  (*Id.*)  Plaintiff reported being independent with cooking twice a week, shopping, showering, bathing, grooming, and dressing.  (Tr. 240.)  His girlfriend did the cleaning and laundry.  (*Id.*)

Upon examination, Dr. Shtock reported that Plaintiff was six feet and six inches tall and 168 pounds without shoes.  (*Id.*)  He appeared to be in no acute distress, had normal gait, could walk on his heels and toes without difficulty, was unable to squat beyond fifty percent maximum capacity, had normal station, and presented without an assistive device.  (*Id.*)  He did not need help changing for the exam or getting on or off the examination table, and he was able to rise from his chair without difficulty.  (*Id.*)

Regarding Plaintiff's cervical spine, Dr. Shtock found flexion to 40 degrees, extension to 35 degrees, rotation to 55 degrees to the right and 60 degrees to the left, and side bending to 35 degrees bilaterally.  (*Id.*)  He had no reported tenderness, muscle spasm, or trigger points.  (*Id.*)  For his upper extremities, Dr. Shtock found that Plaintiff had full range of motion in his shoulders, elbows, forearms, wrists, and fingers bilaterally.  (*Id.*)  He found no joint inflammation, effusion, or instability.  (*Id.*)  Plaintiff had full muscle strength in his proximal and distal muscles, and there was no muscle atrophy or sensory abnormality.  (*Id.*)  Plaintiff's reflexes were physiologic and equal.  (*Id.*)

In Plaintif's thoracic and lumbar spines, flexion was to 60 degrees, extension was to 30 degrees, and lateral flexion and rotary movements were to 20/25 degrees with reported tenderness in the lumbar paraspinal.  (Tr. 240–41.)  There was no sacroiliac joint or sciatic notch tenderness, no muscle spasm, and no scoliosis or kyphosis.  (Tr. 241.)  Straight-leg raise was negative bilaterally, and there were no trigger points.  (*Id.*)  Regarding Plaintiff's lower

extremities, Dr. Shtock found full range of motion in Plaintiff's right hip, and full muscle strength in the proximal and distal muscles. (*Id.*) Left hip flexion was to 95 degrees, internal rotation was to 25 degrees, and external rotation was to 30 degrees. (*Id.*) There was full range of motion of the bilateral knees and ankle joints. (*Id.*) Plaintiff had full muscle strength in the left lower extremities, there was no sensory abnormality, and reflexes were physiologic and equal. (*Id.*)

Dr. Shtock diagnosed reported history of lower back pain, reported history of episodic numbness in the left hand, reported history of anxiety and panic attacks, and reported history of heart attack. (*Id.*) In his medical source statement, he wrote that Plaintiff had mild limitation with kneeling, frequent stair climbing, and walking long distances; mild to moderate limitations with heavy lifting, crouching, standing long periods and sitting long periods; and moderate limitation with squatting and frequent bending. (*Id.*) He found that Plaintiff had no limitation performing overhead activities using both arms or using both hands for fine and gross manual activities. (*Id.*)

9.    Consultative Examiner:  Dr. Johanina McCormick

Also on February 10, 2015, Plaintiff was examined by Dr. Johanina McCormick (Dr. McCormick"), Ph.D., a Psychologist. (Tr. 251.) Plaintiff reported to Dr. McCormick that he had difficulty falling asleep due to restlessness, but that his appetite was normal. (*Id.*) He stated that sometimes he felt like he was having a heart attack and would have palpitations and trouble breathing due to panic. (*Id.*) He reported short-term memory deficits due to cognitive problems. (*Id.*) He also reported "someone calling his name," which Dr. McCormick wrote was "probably related to anxiety [rather] than a thought disorder." (*Id.*)

Plaintiff reported taking thirty milligrams of Oxycodone twice a day for pain. (*Id.*) He reported taking it as prescribed. (Tr. 251–52.) Dr. McCormick stated that Plaintiff responded

cooperatively to questions and that his presentation was adequate. (Tr. 252.) Plaintiff had normal hygiene and motor behavior and appropriate eye contact. (*Id.*) His affect was dysphoric,[9] his mood was neutral, his sensorium was clear, and he was oriented in three dimensions. (*Id.*) Dr. McCormick found that Plaintiff's intellectual functioning was below average, and his insight and judgment were fair. (Tr. 253.)

Plaintiff reported being able to dress, bathe, groom himself, cook, clean, do laundry, shop, and manage money. (*Id.*) He preferred to be accompanied when taking public transportation because of severe anxiety, and he did not socialize. (*Id.*) His family was "supportive" and he enjoyed watching television and listening to the radio. (*Id.*)

In her medical source statement, Dr. McCormick concluded that Plaintiff could follow and understand simple directions and instructions and could also perform simple tasks independently. (*Id.*) He was mildly impaired in maintaining attention and concentration due to distractibility, and was markedly impaired in maintaining a regular schedule. (Tr. 252–53.) His remote memory skills were mildly impaired. (Tr. 252.) He could learn new tasks with help. (Tr. 253.) Plaintiff was moderately impaired in performing complex tasks independently and would need supervision. (*Id.*) Dr. McCormick opined that Plaintiff could make appropriate decisions and relate to others. (*Id.*) However, he was markedly impaired in appropriately dealing with stress, and his difficulties were caused by anxiety and short-term memory deficits. (*Id.*) He needed assistance managing funds due to concentration problems. (Tr. 254.) She diagnosed him with moderate opiate use and panic attacks without agoraphobia. (Tr. 253.) She recommended that Plaintiff continue with outpatient mental health treatment and medical follow-up and evaluation and concluded that his prognosis was fair if he complied with treatment. (*Id.*)

---

[9] Dysphoria is a state of feeling unwell or unhappy. *See* Merriam-Webster Dictionary, *Dysphoria*, https://www.merriam-webster.com/dictionary/dysphoria (last visited 3/24/17).

### C.    Non-Medical Evidence

#### 1.    Plaintiff's Disability Reports and Applications

Plaintiff was born in 1968.  (Tr. 154.)  He reported that his highest level of education was eleventh grade.  (Tr. 169.)  Before his condition became too severe for him to work, he had worked as a sanitation helper for Grace Carting, picking up garbage from May 2010 to September 2012.  (Tr. 169, 184.)  In that role, he walked, stood, climbed, knelt, crouched, stooped, and reached for eleven hours per day, and sat for one hour per day.  (Tr. 186.)  He lifted garbage bags and boxes all day, which was when his back problems "got really bad."  (*Id.*)  He carried fifty pounds frequently and hundred pounds or more occasionally.  (*Id.*)

Prior to that, he had worked for landscapers (1986–1992 and in 2004) and as a janitor (1994–1995).  (Tr. 207.)  Plaintiff wrote that he had stopped working on September 8, 2012, because of his conditions, as well as for other reasons.  (Tr. 168.)  He wrote that he had been laid off.  (*Id.*)  He also wrote that work had been very hard for him because of his chronic back problems and numbness on his left side.  (*Id.*)

#### 2.    May 29, 2013 Function Report

Plaintiff reported that he lived with family.  (Tr. 175.)  He took care of his eight-year-old son with the help of his fiancé.  (Tr. 176.)  His back pain affected his sleep—while he could fall asleep, the back pain would wake him up and keep him awake.  (*Id.*)  He could bathe, care for his hair, shave, and feed himself.  (Tr. 176-77.)  He could dress himself and use the toilet with pain. (*Id*.)  He did not need any help taking care of his personal needs or grooming.  (Tr. 177.)

Because Plaintiff could not stand for long, he would cook meals that did not take long to cook, and did so three to four times per week.  (*Id.*)  He could do laundry, but needed help with cleaning because he could not bend very well.  (Tr. 178.)  He went outside almost every day depending on how he felt, and used public transportation.  (*Id.*)  Although he could go out alone,

he did not like to. (*Id.*) He went shopping about once a month, and was able to handle his finances. (Tr. 179.) His hobbies were watching television and listening to music, which he did every day. (*Id.*) However, when he was in pain, he did not enjoy these activities as much. (*Id.*)

Plaintiff reported talking on the phone and computer with others almost every day, and stated that did not have any problems getting along with others. (Tr. 180.) Since his conditions had begun, he did not go out with friends or family as often as he used to. (*Id.*) Plaintiff reported that he could not lift because his doctor did not want him to, and could not stand, walk, or sit for very long. (Tr. 180–81.) He could climb stairs with a lot of pain, could reach with some pain, and could not kneel or squat. (Tr. 181.) He did not use any assistive devices. (*Id.*)

Plaintiff reported that he could walk four blocks before having to stop and rest, and would need to rest for fifteen to twenty minutes before continuing walking. (Tr. 182.) He reported that he could finish what he started, but would zone out from time to time. (*Id.*) He wrote that he did not handle stress very well and would "forget things." (Tr. 183.)

### 3. October 3, 2013 Appeal Report

In his "Disability Report-Appeal," Plaintiff reported that he "may be a little worse" and was "still unable to work." (Tr. 190.) He wrote that he was unable to sit, stand, or walk for eight continuous hours, and was depressed. (*Id.*)

### 4. FICA-Covered Earnings

FICA-covered earnings were reported by Executive Trading Company in 1999; Pergament Home Centers in 2000-01; Adecco Strategic Alliances Inc. in 2001, 2003, and 2004; Placers Ltd. in 2001 and 2002; Lowes Home Centers in 2005; and D&D Carting in 2006. (Tr. 159–60.) Plaintiff also reported self-employment earnings in 2007, 2009, and 2010. (Tr. 160–61.)

5.     February 26, 2015 Administrative Hearing: Plaintiff's Testimony

Plaintiff testified at the February 26, 2015 hearing.  (Tr. 56.)  He stated that he lived in an apartment with his girlfriend and son.  (Tr. 58.)  His last job was in sanitation, but he had stopped working in 2012 because of chronic back pain and panic attacks.  (*Id.*)

He was taking medication for back pain, and it helped "somewhat."  (*Id.*)  He had tried physical therapy exercises, and they had not helped.  (*Id.*)  When asked whether changing positions between sitting and standing helped, he stated that he had to move back and forth and could not sit still.  (Tr. 59.)

He stated that he could stand for half an hour, sit for ten to fifteen minutes, and walk about two city blocks before having to stop.  (Tr. 60.)  He could not lift a five-to-ten pound grocery bag, but could lift a one- or two-pound bag of sugar.  (Tr. 61.)  He stated that he cooked, read, and watched television, but did not go grocery shopping or clean the apartment.  (*Id.*).  He acknowledged smoking half a pack of cigarettes per day.  (Tr. 62.)  He testified that on an average day, he watched television until his son came home, and then he would help him with his schoolwork.  (*Id.*)

Plaintiff testified that he got panic disorders,[10] and they would make him very nervous, as if he was having another heart attack.  (Tr. 59.)  When he would get these panic attacks, his whole left side would go numb.  (*Id.*)  Plaintiff testified that he saw a psychiatrist once a month, and that the medication the psychiatrist prescribed helped "somewhat."  (Tr. 59–60.)  Plaintiff stated that it was hard for him to concentrate and remember things, and that it was hard to be around people he did not know.  (Tr. 60.)  Plaintiff stated that he could not go to school for parent-teacher meetings because he could not be in crowded areas, and that his girlfriend would

---

[10] The Court infers that he meant panic attacks.

go instead.  (Tr. 62.)  Plaintiff reported that he did not take public transportation because of his

panic disorders, and that his brother would drive him to his doctor appointments.  (Tr. 65.)

When asked about the side effects of his medications, Plaintiff said they made him dizzy.

(Tr. 64.)  He did not sleep well at night, and would get about four or five hours of sleep.  (*Id.*)

He stated that when he got panic attacks with heart-attack symptoms and numbness on his left

side, the symptoms would last about forty-five minutes to an hour.  (*Id.*)  He got panic attacks all

day, even when he was home alone.  (*Id.*)  He got headaches four times a week for about twenty

minutes each, and would take Ibuprofen.  (*Id.*)

When asked whether he had had follow-up cardiac or heart care since his heart attack,

Plaintiff said no and that he was doing better with that.  (Tr. 59.)

## DISCUSSION

### I. STANDARD OF REVIEW

In reviewing a denial of DIB to claimants under the Social Security Act (the "Act"),

federal district courts must determine "whether the SSA's decision was supported by substantial

evidence and based on the proper legal standard." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115,

118 (2d Cir. 1998).  The term "substantial" does not require that the evidence be overwhelming,

but rather that the evidence must be "'more than a mere scintilla[;]  [i]t means such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson*

*v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229

(1938)).    In  determining  whether  the  Commissioner's  findings  were  based  on  substantial

evidence, "'the reviewing court is required to examine the entire record, including conflicting

evidence and evidence from which contradictory inferences can be drawn.'"  *Selian v. Astrue*,

708 F.3d 409, 417 (2d Cir. 2013) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir.

1983) (per curiam)).  A district court's role in reviewing the Commissioner's final decision is limited, because "it is up to the agency, and not this court, to weigh the conflicting evidence in the record." *Clark*, 143 F.3d at 118.  Thus, as long as "the ALJ has applied the correct legal standard," and "the ALJ's findings are supported by evidence that a reasonable mind would accept as adequate, the ALJ's decision is binding on the court." *Petre v. Comm'r of Soc. Sec.*, No. 13-CV-2657, 2015 WL 6971212, at *3 (E.D.N.Y. Nov. 10, 2015).

## II.    ELIGIBILTIY STANDARD FOR SOCIAL SECURITY DISABILITY BENEFITS

In order to be found eligible for DIB, claimants must be disabled as defined by the Act. Claimants are disabled under the meaning of the Act when they are unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The claimant must prove that the impairment is "of such severity that [the claimant] is not only unable to do [his or her] previous work but cannot, considering [his or her] age, education, and work experience, engage in any other substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).  However, the ALJ has an affirmative obligation to develop the administrative record.  *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508–09 (2d Cir. 2009).  This means that the ALJ must seek additional evidence or clarification when the claimant's medical reports contain conflicts or ambiguities, if the reports do not contain all necessary information, or if the reports lack medically acceptable clinic and laboratory diagnostic techniques.  *Demera v. Astrue*, No. 12-CV-432, 2013 WL 391006, at *3 (E.D.N.Y. Jan. 24, 2013); *Mantovani v. Astrue*, No. 09-CV-3957, 2011 WL 1304148, at *3 (E.D.N.Y. March 31, 2011).

In evaluating disability claims, the ALJ must adhere to a five-step inquiry.  20 C.F.R. § 404.1520(a)(4) (2012).  The claimant bears the burden of proof in the first four steps in the

inquiry; the Commissioner bears the burden in the final step. *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). First, the ALJ determines whether the claimant is currently engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). If the answer is yes, the claimant is not disabled. If the claimant is not engaged in "substantial gainful activity," the ALJ proceeds to the second step to determine whether the claimant suffers from a "severe impairment." 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is determined to be severe when it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the impairment is not severe, then the claimant is not disabled within the meaning of the Act. However, if the impairment is severe, the ALJ proceeds to the third step, which considers whether the impairment meets or equals one of the impairments listed in the Act's regulations (the "Listings"). 20 CFR § 404.1520(a)(4)(iii); *see also* 20 C.F.R. pt. 404, subpt. P, app. 1.

If the ALJ determines at step three that the claimant has one of the listed impairments, then the ALJ will find that the claimant is disabled under the Act. 20 C.F.R. § 404.1545(a)(1). On the other hand, if the claimant does not have a listed impairment, the ALJ must determine the claimant's "residual functional capacity" ("RFC") before continuing with steps four and five. *Id.* The claimant's RFC is an assessment which considers the claimant's "impairment(s), and any related symptoms . . . [which] may cause physical and mental limitations that affect what [the claimant] can do in a work setting." 20 C.F.R. § 404.1545(a)(1). The ALJ will then use the RFC determination in step four to determine if the claimant can perform past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the answer is yes, the claimant is not disabled. *Id.* Otherwise the ALJ will proceed to step five where the Commissioner then must determine whether the claimant, given the claimant's RFC, age, education, and work experience, has the capacity to

perform other substantial gainful work in the national economy.  20 C.F.R. § 404.1520(a)(4)(v).
If the answer is yes, the claimant is not disabled.  *Id.*  However, if not, the claimant is disabled
and is entitled to benefits.  *Id.*

## III.    THE ALJ's DECISION

On March 6, 2015, the ALJ issued a decision denying Plaintiff's claim.  (Tr. 9–25.)  The
ALJ found that Plaintiff met the insured status requirements of the SSA through December 31,
2018.  (Tr. 14.)  At the first step, the ALJ concluded that Plaintiff had not engaged in substantial
gainful activity since September 8, 2012, the alleged onset date.  (*Id.*)  He found that although
Plaintiff had worked after the alleged onset date, the work did not rise to the level of substantial
gainful activity, although he found that Plaintiff's work as a sanitation helper in 2013
"demonstrate[d] an ability to perform work on at the very least a light exertional level."  (*Id.*)

At step two, the ALJ found that Plaintiff had three severe impairments: depressive
disorder, anxiety-related disorder, and back disorder, that resulted in more than minimal
limitations in Plaintiff's ability to perform basic work functions.  (*Id.*)

At step three, the ALJ, only specifically addressing Plaintiff's mental impairments, found
that Plaintiff did not have an impairment or combination of impairments that met or medically
equaled the severity of a listing.[11]  (*Id.*)  With respect to Plaintiff's non-physical issues, the ALJ
found that they did not meet listing 12.04 ("Affective Disorders) or 12.06 ("Anxiety-Related
Disorders").  (Tr. 15.)  First, he evaluated whether Plaintiff met the "paragraph B" criteria.[12]  He

---

[11] The ALJ did not address Plaintiff's back disorder whatsoever at step three, in spite of
having found it to be a severe impairment along with Plaintiff's depressive disorder and anxiety
related disorder.  (Tr. 14.)  Plaintiff, however, does not dispute the ALJ's determination that the
back disorder did not meet or medically equal the severity of a listing.

[12] The "paragraph B" criteria require that the mental impairments must result in at least
two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in
maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence,

found that in activities of daily living, Plaintiff had mild restriction. (Tr. 15.) He found relevant that Plaintiff could bathe, dress, groom himself, prepare food, cook, do laundry, take care of his young son, go outside almost daily, use public transportation, shop for food and clothing, pay bills, handle a savings account, watch television, read, and listen to music. (*Id.*) The ALJ found that claimant also had only mild difficulties in social functioning. (*Id.*) Plaintiff stayed in contact with others by phone and computer almost daily, had no problems getting along with others, had never lost a job due to inability to get along with others, had no difficulty relating to the consultative examiners or treating sources, and stated that his family was supportive. (*Id.*) With regard to concentration, persistence, or pace, the ALJ found that Plaintiff had moderate difficulties. (*Id.*) The ALJ noted that Plaintiff alleged that he could not finish what he started, had trouble remembering things, but was able to follow spoken and written instructions. (*Id.*) The ALJ noted that Dr. Brown and Dr. McCormick had opined that Plaintiff was only mildly limited in his ability to maintain attention and concentration. (*Id.*) Finally, the ALJ found that Plaintiff had experienced no episodes of decompensation. (*Id.*) Thus, the paragraph B criteria were not satisfied.[13] (*Id.*) He further found that the paragraph C criteria were not satisfied,[14] as none of the factors were present in the record. (*Id.*)

---

or pace; or (4) repeated episodes of decompensation, each of extended duration. Listing of Impairments, 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.04(B) (2016).

[13] The ALJ explicitly stated that the limitations identified in the paragraph B criteria were not a residual function capacity assessment, which required a more detailed assessment. (Tr. 16.)

[14] To satisfy the requirements of paragraph C under Listing 12.04, Plaintiff must show a:

Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

The ALJ next concluded that Plaintiff had RFC to perform light work as defined in Physical Exertion Requirements, 20 C.F.R. § 404.1567(b) (2017), except that he was restricted to jobs involving simple, routine, repetitive tasks.  (Tr. 16.)[15]  In making this determination, the ALJ followed the RFC two-step process.  (*Id.*)  The ALJ stated that "[a]fter careful consideration of the evidence, [he] [found] that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision."  (*Id.*)  The ALJ did not provide any further explanation for his non-credibility finding with respect to Plaintiff.  (*See id.*)

To support his finding that Plaintiff could perform light work, the ALJ relied upon the findings of Dr. Brown, Dr. Tranese, Dr. Martin, Dr. Schtock, Dr. McCormick, and the MRIs. (Tr. 17-19.)  The ALJ recited Dr. Brown's findings, and then stated that he "g[a]ve Dr. Brown

---

2.  A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3.  Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(C).

[15] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  20 C.F.R. § 404.1567(b).  "Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  *Id.*  "To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."  *Id.*  "[T]he full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday."  SSR 83-10, 1983 WL 31251, at *6 (Jan. 1, 1983).

considerable weight." (Tr. 17.)  He wrote that he "concur[red] with her opinion that claimant [was] capable of performing simple work tasks," although noted, without any supportive reasoning, that he felt, in contrast to Dr. Brown, that Plaintiff was capable of performing them without assistance. (*Id.*)  He agreed with Dr. Brown that Plaintiff could maintain attention, concentration, and a regular work schedule, make appropriate decisions, and relate adequately to others. (*Id.*)

In similar fashion, the ALJ recited Dr. Tranese's findings and concluded that he "concur[red] with this assessment and [gave] it significant weight." (Tr. 17–18.)  The ALJ wrote, "[t]here is noting in Dr. Tranese's conclusions that would prevent claimant from performing work at the light exertional level." (Tr. 18.)

The ALJ also wrote that he gave Dr. Martin's RFC finding "significant weight, as his [RFC] is essentially consistent with the physical capabilities required to perform work at the light exertional level." (*Id.*)  The ALJ pointed to Dr. Martin's findings that Plaintiff could lift/carry 20 pounds and sit/stand/walk about four hours in an eight-hour workday, could frequently twist and occasionally stoop, crouch, and climb stairs. (*Id.*)  He wrote that medical findings supported these limitations. (*Id.*)

The ALJ recited the MRI findings without analysis. (*Id.*)  The ALJ recited Dr. Shtock's findings and medical source statement. (*Id.*)  He wrote that he gave minimal weight to Dr. Shtock's conclusion that Plaintiff could only lift/carry 10 pounds and stand/walk for two hours because it was inconsistent with Dr. Martin's assessment  that Plaintiff could lift/carry 20 pounds and sit/stand/walk about four hours in an eight-hour. (Tr. 19.)  In explaining his reliance on Dr. Martin's conclusions, over Dr. Shtock's, the ALJ noted that Dr. Martin had treated Plaintiff for a

29

number of years, was familiar with his medical history, and was in "a far better position to determine claimant's limitations and capabilities" than Dr. Shtock.  (*Id.*)

The ALJ also recited Dr. McCormick's findings and stated that he concurred with her conclusion that Plaintiff could follow, understand, perform simple tasks independently, make appropriate decisions, and relate adequately to others.  (*Id.*)  At the same time, though, the ALJ rejected Dr. McCormick's findings that Plaintiff would be markedly impaired in maintaining a regular schedule or markedly impaired in dealing with stress appropriately, as "there [was] no evidence to support these limitations."  (*Id.*)

The ALJ additionally referenced the findings of Dr. Conciatori-Vaglia that Plaintiff's anxiety was well-controlled with Xanax, and that he was doing well without any sign of depression, as well as Dr. Conciatori-Vaglica's findings that Plaintiff had normal affect, no illogical thought content or process, and intact memory and insight.  (*Id.*)

The ALJ also discussed Dr. Martin's treatment notes, drawing attention only to those notes that undermined Plaintiff's complaints and failing to mention those notes that corroborated Plaintiff's complaints.  (*See id.*)  The ALJ noted that Plaintiff did not appear to comply with Dr. Martin's recommendation that he attend physical therapy.  (*Id.*)  The ALJ also remarked that Dr. Martin's notes did not contain any mention of Plaintiff's alleged 2012 heart attack or contain any echocardiograms.  (*Id.*)  He noted that Plaintiff denied chest pain during the majority of his appointments, and that Dr. Martin had not diagnosed Plaintiff with hypertension.  (*Id.*)  The ALJ noted, however, that Dr. Martin's notes indicated that Plaintiff underwent a cardiology workup and was cleared for physical therapy on June 5, 2014.  (*Id.*)  The ALJ also noted that no records were ever submitted from Brooklyn Hospital about the alleged stay in 2012 for the heart attack.  (*Id.*)

At step four, the ALJ concluded that Plaintiff could not perform his past work in sanitation, which was at the light to medium exertional level. (Tr. 19.)

The ALJ then considered Plaintiff's RFC, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2. (Tr. 20.) He noted that a finding of "not disabled" was appropriate under Medical-Vocational Rule 202.17, because Plaintiff's additional limitations had little or no effect on the occupational base of unskilled light work. (*Id.*)

The ALJ thus concluded that Plaintiff "ha[d] not been under a disability . . . from September 12, 2012, through the date of this decision." (*Id.*)

## IV.    ANALYSIS

Plaintiff argues on appeal that the ALJ (1) failed to properly weigh the medical opinion evidence; (2) failed to properly evaluate Plaintiff's credibility; and (3) erred by relying on the Medical-Vocational Guidelines. The Court agrees on all three counts.

### A.    The ALJ Failed to Properly Weigh the Medical Opinion Evidence

The treating physician rule "generally requires deference to the medical opinion of a claimant's treating physician[.]" *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). According to SSA regulations, the Commissioner will give "controlling weight" to "a treating source's medical opinion on the issue(s) of the nature and severity of ... impairment(s) [so long as the opinion] is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(c)(2). Medically acceptable clinical and laboratory diagnostic techniques include consideration of a "patient's report of complaints, or history, [a]s an essential diagnostic tool." *Green–Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir. 2003) (citation omitted).

Although the ALJ stated that he gave "significant weight" to Dr. Martin's opinion as the treating physician, he erred in finding that Dr. Martin's RFC was "essentially consistent with the physical capabilities required to perform work at the light exertional level." (Tr. 18.) The ALJ relied heavily on Dr. Martin's finding that Plaintiff could lift/carry 20 pounds and sit/stand/walk for about four hours in an eight-hour workday. (*Id.*) Yet SSR 83-10 states that "[s]ince frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." SSR 83-10, 1983 WL 31251, at *6 (Jan. 1, 1983). Dr. Martin's opinion, therefore, is directly contradictory to a finding that Plaintiff could perform light exertional work, because Dr. Martin found that Plaintiff could only sit/stand/walk for four hours, as opposed to six.[16]

Furthermore, Dr. Martin found that Plaintiff could only sit for forty-five (45) minutes before needing to change positions, could only stand for thirty (30) minutes before changing positions, and needed the opportunity to shift *at will* from sitting or standing/walking. (Tr. 224–25.) The ALJ failed to recognize that this description is not consistent with the general description of light work, but rather, is consistent with the description of work with a sit/stand option. SSR 83-12 provides a description of the "special situation[] in which a claimant must

---

[16] Defendant's only response is that Dr. Tranese, the consultative physician, assessed that Plaintiff had no limitations in standing/walking and sitting, and that such an opinion "provided substantial evidence for the ALJ's finding that Plaintiff could do light work." (Def's Br. at 17.) This argument fails on its face. Besides the fact that the ALJ explicitly stated that he was giving Dr. Martin's opinion, which contradicted this finding, significant weight, an ALJ cannot adopt the opinion of a consultative examiner over that of a treating physician without good reasons. *See Burgin v. Astrue*, 348 F. App'x 646, 648 (2d Cir. 2009) (quoting *Halloran*, 362 F.3d at 33) ("The failure to provide 'good reasons' for not crediting a treating source's opinion is a ground for remand."); *Anderson v. Astrue*, No. 07-CV-4969, 2009 WL 2824584, at *9 (E.D.N.Y. Aug.28, 2009) (explaining that the opinion of a consultative physician, "who only examined a Plaintiff once, should not be accorded the same weight as the opinion of [a] plaintiff's treating [physician]").

alternate sitting and standing," which fits precisely with how Dr. Martin described Plaintiff's

limitations:

> In some disability claims, the medical facts lead to an assessment of RFC which is compatible with the performance of either sedentary or light work except that the person must alternate periods of sitting and standing. The individual may be able to sit for a time, but must then get up and stand or walk for awhile before returning to sitting. Such an individual *is not functionally capable* of doing either the prolonged sitting contemplated in the definition of sedentary work (and for the relatively few light jobs which are performed primarily in a seated position) or the prolonged standing or walking contemplated for most light work.

SSR 83-12, 1983 WL 31253, at *4 (Jan. 1, 1983) (emphasis added). SSR 83-12 goes on to state

that, because "most jobs have ongoing work processes which demand that a worker be in a

certain place or posture for at least a certain length of time to accomplish a certain task[,] and

"[u]nskilled types of jobs are particularly structured so that a person cannot ordinarily sit or stand

at will[,] . . . a [Vocational Expert] should be consulted to clarify the implications for the

occupational base." *Id.* Because the ALJ did not recognize the applicability of SSR 83-12, he

did not follow its guidance with respect to consulting with a Vocational Expert.

The ALJ also ignored other aspects of Dr. Martin's opinion that undermined his

conclusion that Plaintiff could do light work. For example, Dr. Martin concluded that Plaintiff's

impairments or treatment would cause Plaintiff to be absent three or more times per month, a

finding that vocational experts routinely opine precludes all work. *See Garcia v. Comm'r of Soc.

Sec.*, 208 F. Supp. 3d 547, 553 (S.D.N.Y. 2016) (noting that the vocational expert stated that

three or more absences per month would "preclude all work"); *Laracuente v. Colvin*, 212 F.

Supp. 3d 451, 465 (S.D.N.Y. 2016) (vocational expert testified that if an individual was absent

more than three times per month on a continuing basis, she could not be expected to perform

work); *Healy v. Colvin*, No. 3:15-CV-01579, 2016 WL 4581403, at *8 (D. Conn. Sept. 2, 2016)

(vocational expert opined that an individual who was absent from work more than three times a

33

month would be precluded from finding work).  The ALJ also failed to discuss any of Dr.

Martin's treatment notes regarding Plaintiff's anxiety or depression and how those limitations

might affect Plaintiff's ability to work.

Finally, the ALJ did not explain why he gave "significant weight" to the opinion of

consulting orthopedist Dr. Tranese, or why he gave "considerable weight" to the opinion of

consulting psychiatrist Dr. Brown.  (Tr. 17–18.)  In discussing Dr. Tranese's opinion, the ALJ

merely recited Dr. Tranese's findings, and then stated in totally conclusory fashion that he

"concur[red] with this assessment and [gave] it significant weight" and that "[t]here [was]

nothing in Dr. Tranese's conclusions that would prevent claimant from performing work at the

light exertional level."  (Tr. 18.)  Similarly, the ALJ merely recited Dr. Brown's findings and

then stated, without explanation, that he gave them considerable weight.  (Tr. 17.)  The ALJ

further stated that he concurred with some of Dr. Brown's opinions—those that supported the

conclusion that Plaintiff has little or no limitations—but disagreed with her opinion that Plaintiff

needed assistance to perform simple work tasks, because the ALJ "felt" that Plaintiff was

"capable of performing these tasks without assistance."  (Tr. 17.)  As with his analysis of Dr.

Martin's RFC opinion, in deciding which parts of Dr. Brown's opinion to rely on, the ALJ

improperly worked backward from his conclusion that Plaintiff could perform light work,

crediting only those medical opinions that were consistent with this conclusion and disregarding

those that were not.  *See, e.g.*, *Morales v. Astrue*, No. 11-CV-1853, 2012 WL 414236, at *10

(S.D.N.Y. Feb. 9, 2012) (remanding in part because "[i]n making his RFC finding, the ALJ

appears to have worked backwards, first determining [the plaintiff's] RFC, and then supporting

his decision by relying principally on [a consultative source]"); *Smith v. Apfel*, 69 F. Supp. 2d

370, 377 (N.D.N.Y. 1999) (finding that the ALJ failed to apply the proper legal standard to

34

plaintiff's treating physician's opinion, where "it appear[ed] that the ALJ simply chose the portions of [the treating physician's] report that supported his conclusion, and ignored significant evidence which contradicted that conclusion."); *see also Arias v. Astrue*, 11-CV-1614, 2012 WL 6705873, at \*2 (S.D.N.Y. Dec. 21, 2012) ("The ALJ may not simply ignore contradictory evidence.  When the record contains testimony tending to contradict the ALJ's conclusion, the ALJ must acknowledge the contradiction *and explain why the conflicting testimony is being disregarded*." (emphasis added)); *Sutherland v. Barnhart*, 322 F. Supp. 2d 282, 289 (E.D.N.Y. 2004) ("It is not proper for the ALJ to simply pick and choose from the transcript only such evidence that supports his determination . . . .").

Despite the ALJ's finding that he gave Dr. Martin's opinion significant weight, the ALJ's conclusions were inconsistent with Dr. Martin's opinion.  It is clear, therefore, that he did not, in fact, give Dr. Martin's opinion significant or controlling weight.  When an ALJ fails to give a treating physician opinion controlling weight, he is required to "consider various 'factors' to determine how much weight to give to the opinion."  *Halloran*, 362 F.3d at 32 (citing 20 C.F.R. § 404.1527(d)(2), now codified at 20 C.F.R. § 404.1527(c)(2)).[17]  Here, the ALJ appears to have skipped over this entire analysis, instead simply declaring that he was giving Dr. Martin's opinion significant weight.[18]  The ALJ's report neither explicitly discusses the relevant factors,

---

[17] These factors include:  (1) "the frequency of examination and the length, nature and extent of the treatment relationship;" (2) "the evidence in support of the opinion:" (3) "the opinion's consistency with the record as a whole;" and (4) "whether the opinion is from a specialist."  *Clark*, 143 F.3d at 118; *accord Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008).  Although "[t]he ALJ is not required to explicitly discuss the factors," "it must be clear from the decision that the proper analysis was undertaken."  *Elliott v. Colvin*, 13-CV-2673, 2014 WL 4793452, \*15 (E.D.N.Y. Sept. 24, 2014).

[18] Even if the ALJ *had* given Dr. Martin's opinion significant weight, he would still need to give good reasons and a comprehensive explanation of why he was not giving it controlling weight.  *See Halloran*, 362 F.3d at 32–33.

nor is it otherwise "clear from [his] decision that the proper analysis was undertaken." *Elliott*, 2014 WL 4793452, at *15. Accordingly, the Court finds the ALJ erred by not according the opinion of Plaintiff's treating physician controlling weight or by failing to demonstrate that he undertook the proper analysis in deciding to accord that opinion little weight. *Halloran*, 362 F.3d at 33 (stating that ALJ must "comprehensively set forth [his or her] reasons for the weight assigned to [the] treating physician's opinion"); *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir.1999) (citing 20 C.F.R. § 404.1527(c)(2)) (stating that the Social Security agency "will always give good reasons in [its] notice of determination or decision for the weight [given to a] treating source's opinion"). "The failure to provide 'good reasons' for not crediting a treating source's opinion is ground for remand." *See Burgin*, 348 F. App'x at 648 (alteration in original omitted) (quoting *Halloran*, 362 F.3d at 33) (stating that the Second Circuit will "not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and . . . will continue remanding when [the Second Circuit] encounter[s] opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion.").

### B.    The ALJ Erred in Assessing Plaintiff's Credibility

In assessing whether a claimant is disabled, the ALJ may consider the claimant's allegations of pain and functional limitations. *See Fernandez v. Astrue*, No. 11-CV-3896, 2013 WL 1291284, at *18 (E.D.N.Y. Mar.13, 2013) (citing *Taylor v. Barnhart*, 83 F. App'x 347, 350 (2d Cir. 2010). However, the ALJ retains the discretion to assess the claimant's credibility. *See id.* (citing *Correale–Englehart v. Astrue*, 687 F.Supp.2d 396, 434 (S.D.N.Y. 2010)). The SSA regulations provide a two-step process for evaluating a claimant's assertions of pain and other limitations. *See id.* First, the ALJ must decide whether the claimant suffers from a "medically determinable impairment that could reasonably be expected to produce" the symptoms alleged.

36

20 C.F.R. § 404.1529(b) (2017). Second, where the record shows that the claimant has such a medically determinable impairment, the ALJ evaluates "the intensity and persistence of [the claimant's] symptoms" to determine the extent to which they limit the claimant's ability to work. 20 C.F.R. § 404.1529(c); *see also Fernandez*, 2013 WL 1291284, at *18. Where the ALJ finds that the claimant's testimony is inconsistent with the objective medical evidence in the record, the ALJ must evaluate the claimant's testimony in light of seven factors: 1) the claimant's daily activities; 2) the location, duration, frequency, and intensity of the pain; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the pain; 5) any treatment, other than medication, that the claimant has received; 6) any other measures that the claimant employs to relieve the pain; and 7) other factors concerning the claimant's functional limitations and restrictions as a result of the pain. 20 C.F.R. § 404.1529(c)(3) (i)–(vii).

At the first step, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but then found that Plaintiff's statements regarding the intensity, persistence, and limiting effects of the symptoms were not entirely credible. (Tr. 16.) In reaching the latter conclusion, the ALJ did not engage in any substantive analysis of Plaintiff's credibility. (*See* Tr. 16–20.)

Defendant argues that "although the ALJ decision may not be organized in a manner that Plaintiff would deem ideal, it is evident from the decision that the ALJ considered Plaintiff's statements about the factors listed in the Commissioner's regulations." (Dkt. 14 ("Def. Br.") at 19.) Defendant then performs the type of credibility analysis that the ALJ neglected to do, in order to justify the ALJ's finding of non-credibility. However, Defendant's post-hoc explanation and analysis cannot cure the deficiency of the ALJ's decision. *Lugo v. Apfel*, 20 F. Supp. 2d 662,

664 (S.D.N.Y. 1998) (finding that ALJ's "[c]onclusory determinations" left the "reviewing court no basis on which to determine whether the proper factors were considered and the appropriate legal standards applied [by the ALJ]").[19]   Accordingly, the Court finds that the ALJ erred by failing to explain his credibility determination.

It is therefore appropriate for the Court to remand this case "so that the ALJ can provide [his] reasoning in a manner that enables the Court to perform effective review."  *Id.*; *see Banks v. Astrue*, 955 F. Supp. 2d 178, 190 (W.D.N.Y. 2013) (citing SSR-96-7P, Fed. Reg. at 34,485–86) ("When assessing a claimant's credibility, an ALJ may not simply state in a conclusory manner that he finds the claimant to be not credible.  Rather, the ALJ's decision must contain specific reasons for his finding that are supported by evidence in the record [and] must explain to the individual and a reviewing court the weight given to the testimony and the reasons for the determination."). On remand, if the ALJ continues to find that Plaintiff is not credible, he must provide an explanation of his finding, and in doing so, must consider the required factors listed in 20 C.F.R. § 404.1529(c)(3)(i)-(vii).

---

[19] *See also Escalante v. Astrue*, No 11-CV-375, 2012 WL 13936, at *8 (S.D.N.Y. Jan. 4, 2012) (explaining that "[c]onclusory findings of a lack of credibility will not suffice" and that an ALJ's decision "'must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight'" (quoting SSR 96-7P, 61 Fed. Reg. 34,483, 34,484 (July 2, 1996)); *Castano v. Astrue*, 650 F. Supp. 2d 270, 279 (E.D.N.Y. 2009) ("The ALJ's invocation of the boilerplate phrase 'not entirely credible' to reject plaintiff's complaints is, frankly, not entirely credible."); *see also Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 643 (2d Cir. 1983) (explaining that "[a]lthough the ALJ was not required to credit [the plaintiff's] testimony, he would normally be expected to note his rejection of it in whole or part").  As Plaintiff notes, a "finding that [a] witness is not credible must nevertheless be set forth with sufficient specificity to permit intelligible plenary review of the record."  *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 260–61 (2d Cir. 1988).

### C.    The ALJ Erred by Relying on the Medical-Vocational Guidelines

The ALJ erred by relying on the Medical-Vocational Guidelines for two separate reasons. First, as previously discussed, when someone needs to sit and stand at will, "a [Vocational Expert] should be consulted to clarify the implications for the occupational base." SSR 83-12, 1983 WL 31253, at *4 (Jan. 1, 1983).  In light of Dr. Martin's findings that Plaintiff needed the opportunity to shift at will from sitting or standing/walking (Tr. 224–25), and his findings that Plaintiff could only sit for forty-five minutes at a time and could only stand for thirty minutes at a time (Tr. 224), a Vocational Expert should have been called to testify about Plaintiff's job prospects.  Defendant does not even dispute this, instead simply stating that, "if one were to interpret Plaintiff's argument as asserting that he requires a sit-stand opinion . . . the appropriate remedy would be to remand for vocational expert evidence concerning the existence of jobs." (Def. Br. at 18.)

Second, as Plaintiff points out, "[an] ALJ cannot rely on the [Medical-Vocational grids] if a non-exertional impairment has any more than a 'negligible' impact on a claimant's ability to perform the full range of work, and instead must obtain the testimony of a vocational expert." *Selian v. Astrue*, 708 F.3d 409, 421 (2d Cir. 2013); *see Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986) (when claimant's non-exertional impairments "'significantly limit the range of work permitted by his exertional limitations' then the [Medical-Vocational] grids obviously will not accurately determine disability status because they fail to take into account claimant's nonexertional impairments"); *see also Hernandez v. Colvin*, No. 13-CV-03035, 2014 WL 3883415, at *14 (S.D.N.Y. Aug. 7, 2014) (explaining that "the Grid is inapplicable in cases where the claimant exhibits a so-called 'non-exertional impairment' that significantly diminishes the claimant's ability to work" (citation omitted)); *Correale-Englehart v. Astrue*, 687 F. Supp. 2d 396, 439 (S.D.N.Y. 2010) (same).  "A nonexertional impairment is non-negligible 'when it . . .

so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity.'" *Selian*, 708 F.3d at 421 (quoting *Zabala v. Astrue*, 595 F.3d 402, 411 (2d Cir. 2010)).

Depression and anxiety are unquestionably non-exertional limitations. *Hernandez*, 2014 WL 3883415, at *14 (finding it "undisputed" that the plaintiff's depression and anxiety were non-exertional impairments that hampered the plaintiff's ability to work); *Correale-Englehart*, 687 F. Supp. 2d at 439 (explaining that "depression and psychological disorders" are considered non-exertional limitations). Thus, if Plaintiff's depression and anxiety significantly diminished his ability to work, the ALJ's reliance on the Medical-Vocational grids was in error. While the ALJ presumably found it appropriate to use the Medical-Vocational grids based on the conclusion that Plaintiff's non-exertional limitations "have little or no effect on the occupational base of unskilled light work" (Tr. 20), the ALJ erred by failing to provide any analysis as to why Plaintiff's anxiety and depression were considered "negligible," when in fact the ALJ also found that Plaintiff had moderate difficulties in concentration, persistence, or pace. (Tr. 14–15.); *see Bapp*, 803 F.2d at 606; *Correale-Englehart*, 687 F. Supp. 2d at 439 (finding that "[w]hether plaintiff's [moderate, episodic depression] constitute[d] [significant] non-exertional limitations and therefore require[d] a non-grid assessment [was] a matter that the ALJ ignored . . . [which] was error"); *Baldwin v. Astrue*, No. 07-CV–6958, 2009 WL 4931363, at *28 (S.D.N.Y. Dec. 21, 2009) (finding the ALJ's conclusion that the plaintiff's non-exertional limitations did not significantly impact his employment prospects to be erroneous and remanding because ALJ failed to consult a vocational expert where plaintiff was found to have moderate psychiatric limitations). "[T]he ALJ is obligated to explain" a finding "that the Grid adequately addresses a plaintiff's non-exertional impairments." *Hernandez*, 2014 WL 3883415, at *15; *Cruz v. Colvin*,

No. 12-CV-7346, 2013 WL 3333040, at *19 (S.D.N.Y. July 2, 2013) (explaining that for an ALJ to find that a plaintiff's non-exertional limitations did not significantly reduce, or only had a negligible impact on, plaintiff's work capacity such that the Grid could be treated as dispositive, the ALJ was "obligated to explain that finding").[20]

While the ALJ's findings regarding the paragraph B criteria are not an RFC assessment, the ALJ clearly credited testimony and evidence supporting Plaintiff's anxiety and depression. As noted, the ALJ did not discuss any of Dr. Martin's findings regarding Plaintiff's anxiety or depression, despite giving Dr. Martin's opinion "significant weight." Furthermore, although the ALJ gave Dr. Brown's opinion "considerable weight," he did not address Dr. Brown's findings that Plaintiff was moderately limited in his ability to deal appropriately with stress due to distractibility, depression, anxiety, and panic attacks, or Dr. Brown's conclusion that Plaintiff had psychiatric problems which "may significantly interfere with the claimant's ability to function on a daily basis." (Tr. 216.)

Thus, given the clear evidence that Plaintiff has non-exertional limitations of an unspecified degree, and requires a sit/stand option, the ALJ, on remand, must either call a Vocational Expert or adequately explain a decision not to do so.[21]

---

[20] Defendant is, of course, correct that "[t]he mere presence of a non-exertional impairment (such as a mental impairment) does not automatically preclude reliance on the [Grid]." (Def. Br. at 22 (citing *Zabala v. Astrue*, 595 F.3d 402, 410–11 (2d Cir. 2010)). But, in *Zabala*, the ALJ's use of the Medical-Vocational Guidelines was permissible because the ALJ had found that the plaintiff's mental condition did not limit her ability to perform unskilled work, including carrying out simple instructions, dealing with work changes, and responding to supervision. Here, the ALJ has not provided sufficient analysis to support such a finding.

[21] As a final note, Defendant argues on appeal that "[a]s an initial matter, it is not clear when (if ever) Plaintiff stopped working as a sanitation worker." (Def Br. at 16.) In light of the ALJ's finding that Plaintiff's work after the alleged disability onset date "did not rise to the level of substantial gainful activity," but "nonetheless demonstrate[d] an ability to perform work on at the very least a light exertional level," (Tr. 14), the Court declines to "affirm [the ALJ's opinion] on grounds different from those considered by the agency." *Burgess*, 537 F.3d at 128.

## CONCLUSION

For the reasons set forth above, the Court DENIES the Commissioner's motion for judgment on the pleadings and GRANTS Plaintiff's cross-motion. The Commissioner's decision is remanded for further consideration and new findings consistent with this Memorandum & Order. The Clerk of Court is respectfully requested to close this case.

SO ORDERED.

/s/ Pamela K. Chen
Pamela K. Chen
United States District Judge

Dated: July 21, 2017
        Brooklyn, New York

42